IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| GERALD J. JOHNSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-11-563 |
| | § | |
| MICHAEL J. ASTRUE | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Magistrate Judge[1] in this social security appeal is Plaintiff's Motion for Summary Judgment (Document No.10), Defendant's Motion for Summary Judgment (Document No. 7) and Defendant's Response to Plaintiff's Motion for Summary Judgment (Document No. 11). After considering the cross motions for summary judgment, the administrative record, and the applicable law, the Magistrate Judge ORDERS, for the reasons set forth below, that Defendant's Motion for Summary Judgment (Document No. 7) is GRANTED, Plaintiff's Motion for Summary Judgment (Document No. 10) is DENIED, and the decision of the Commissioner is AFFIRMED.

---

[1] The parties consented to proceed before the undersigned Magistrate Judge on March 1, 2012. (Document No.6).

## I. Introduction

Plaintiff, Gerald Johnson ("Johnson") brings this action pursuant to the Social Security Act ("Act"), 42 U.S.C. 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration ("Commissioner") denying his application for disability benefits. Johnson argues that substantial evidence does not support the Administrative Law Judge's ("ALJ") decision, and the ALJ, John D. Sullivan, committed errors of law when he found that Johnson was not disabled. Johnson argues that he has been disabled since December 27, 2007, when he injured his left middle finger in a work related accident. His dominant hand is his right hand. According to Johnson, in spite of surgery, multiple steroid injections, and dozens of physical therapy sessions, he is unable to work. According to Johnson, the ALJ erred in his RFC assessment, credibility finding, and rejection of the opinions offered by his treating physician. Johnson seeks an order reversing the ALJ's decision and remanding his claim for further proceedings. The Commissioner responds that there is substantial evidence in the record to support the ALJ's decision that Johnson was not disabled, that the decision comports with applicable law, and that the decision should, therefore, be affirmed.

## II. Administrative Proceedings

On January 6, 2009, Johnson applied for disability insurance benefits claiming that he has been unable to work since December 27, 2007, as a result of injuries sustained from a work place accident. (Tr. 90-91). In particular, Johnson alleged he was disabled due to a left hand traumatic injury, high blood pressure, emotional stress, and a constant high level of pain. (Tr. 118). The Social Security Administration denied his application at the initial and reconsideration stages. (Tr.

45-55).  Johnson then requested a hearing before an ALJ.  (Tr.  56).    The Social Security Administration granted his request, and the ALJ held a hearing on January 21, 2010.  (Tr. 7-22). On March 23, 2010, the ALJ issued his decision finding Johnson not disabled.  (Tr.10-19).  In his decision, the ALJ found that Johnson was not disabled at any time from December 27, 2007, through the date he issued his decision.

Johnson sought review by the Appeals Council of the ALJ's adverse decision.  (Tr. 6).  The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; (4) a broad policy issue may affect the public interest or (5) there is new and material evidence and the decision is contrary to the weight of all the record evidence.  After considering Johnson's contentions, including the submission of additional evidence, in light of the applicable regulations and evidence, the Appeals Council, on August 25, 2010, concluded that there was no basis upon which to grant Johnson's request for review.  (Tr. 1-5).  The ALJ's findings and decision thus became final.  Johnson has timely filed his appeal of the ALJ's decision.  The Commissioner has filed a Motion for Summary Judgment (Document No.7).  Likewise, Plaintiff has filed a Motion for Summary Judgment (Document No.  10), to which Defendant has filed a Response.  (Document No.  11).  This appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1 through 866.  (Document No.  2).  There is no dispute as to the facts contained therein.

### III. Standard for Review of Agency Decision

The court, in its review of a denial of disability benefits, is only "to [determine] (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision as follows: "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence. *Id.* While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues de novo, nor substitute its judgment" for that of the Commissioner even if the evidence preponderates against the Commissioner's decision. *Chaparo v. Bowen*, 815 F.2d 1008, 1009 (5th Cir. 1987); *see also Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999); *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a

suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quoting *Hemphill v. Weinberger*, 483 F.2d 1127 (5th Cir. 1973)).

## IV. Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques. *Id.* § 423(d)(3). The impairment must be so severe as to limit the claimant in the following manner:

> he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

*Id.* § 423(d)(2)(A). The mere presence of an impairment is not enough to establish that one is suffering from a disability. Rather, a claimant is disabled only if he is "incapable of engaging in any substantial gainful activity." *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milan v. Bowen*, 782 F.2d 1284 (5th Cir. 1986)).

The Commissioner applies a five-step sequential process to determine disability status:

1. If the claimant is presently working, a finding of "not disabled" must be made;

2. If the claimant does not have a "severe" impairment or combination of impairments, he will not be found disabled;

3. If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;

4. If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5. If the claimant's impairment prevents him from doing any other substantial gainful activity, taking into consideration his age, education, past work experience, and residual functional capacity, he will be found disabled.

*Id.*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists. If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). Once the Commissioner demonstrates that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett*, 67 F.3d at 563.

In the instant action, the ALJ determined, in his March 23, 2010, decision that Johnson was not disabled at step five because he retained the residual functional capacity (RFC) to perform jobs that exist in significant numbers in the national economy. In particular, the ALJ determined that Johnson was not presently working (step one); that Johnson's laceration to the left middle finger, and reflex sympathetic dystrophy were severe impairments (step two); that Johnson did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in Appendix 1 of the regulations (step three); based on the medical records, and the

testimony of Johnson, the ALJ concluded that Johnson had the RFC to perform a limited range of

light work, [2] and that he was unable to perform his past relevant work as a route truck driver, which

was medium and semi-skilled (step four); and that having taken into consideration Johnson's

impairments, RFC, his age, and education, he could perform jobs such as a school crossing guard,

a linen grader, and a garment sorter, all of which are jobs that exist in the regional and national

economy, and was not disabled within the meaning of the Act (step five). As a result, the Court must

determine whether substantial evidence supports the ALJ's step five finding.

In determining whether substantial evidence supports the ALJ's decision, the court weighs

four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating,

examining and consultative physicians on subsidiary questions of fact; (3) subjective evidence as

testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's

educational background, work history, and present age. *Wren*, 925 F.2d at 126.

## V. Discussion

The objective medical evidence shows that Johnson's left hand was caught in the door of a

mail machine on December 27, 2007. He was treated at Park Plaza Hospital Emergency Room. He

required twelve stitches for the laceration to his left hand middle finger. (Tr. 196-211, 228-44, 355-

---

[2] With respect to Johnson's RFC, the ALJ found:
The claimant is able to lift and carry 20 pounds occasionally and 10 pounds
frequently, stand and walk about 6 hours in an 8 hour day, and sit for at least 6
hours in an 8 hour day. The claimant has unlimited abilities to push and pull and
could only occasionally crawl and climb ladders, ropes and scaffolds. Claimant
was further limited to only occasional fine fingering and gross handling with his
left upper extremity and was precluded from prolonged writing and frequent
keyboarding. Claimant could use his left dominant hand as a helper. Claimant
was further precluded from commercial driving secondary to medications. (Tr.
13-17). It is clear from the text of the ALJ's decision and the medical records that
ALJ meant left non-dominant hand. Johnson's dominant hand is his right.

67, 509-11, 557-64, 685-87, 699-09, 734-35, 749). Johnson had follow up appointments to check his wound with Dr. Samuel L. Siegler on January 4, 8 and 11, 2008. (Tr. 219- 20). Johnson complained of throbbing pain his injured finger and reported the intensity increased when he used his left arm. (Tr. 220). He was evaluated by Dr. Howard Grant at the Binz Clinic on January 22, 2008. (Tr. 569, 774). Dr. Grant's note reflects that Johnson's left middle index finger was "exquisitely tender on palpation" and mild soft tissue swelling was noted. *Id.* An x-ray taken of Johnson's left hand on January 25, 2008 was normal. (Tr. 223, 368, 411, 733). Dr. Grant, in turn, referred Johnson for physical therapy, three times a week for four weeks. Johnson was next seen by Dr. Grant on February 21, 2008. (Tr. 544-45, 599). In the handwritten progress notes, Dr. Grant wrote that Johnson was clinically stable but still in pain. (Tr. 599). Johnson's left middle index finger had "painful movements on abduction, flexion, and extension with associated mild soft tissue swelling noted." (Tr. 544). Dr. Grant's treatment note reveals that Johnson was "still symptomatic" and while Johnson had made progress, his "prognosis was guarded." (Tr. 543-44). Johnson was told by Dr. Grant to continue with physical therapy and return in a month. A month later, March 21, 2008, Dr. Grant noted that Johnson's finger showed tightness and tenderness on palpation and soft tissue swelling. Dr. Grant wrote that Johnson was, overall, "clinically stable" and should continue with physical therapy twice weekly and he prescribed Naprosyn for pain (Tr. 600).

In April, Dr. Grant referred Johnson to Dr. Marcos Masson. (Tr. 371, 373, 416, 417, 418, 422, 424, 548, 550, 606, 607, 608, 653, 654, 730, 732). Johnson reported to Dr. Masson that his pain was constant and moderate in severity. (Tr. 373, 417-1818, 422, 548, 606, 608, 652-53, 730). Dr. Masson noted that the "LLF [was] held in guarded position. FDP and FDS apparently present and working. Hypersensitivity noted from scar at DIP joint distally. The PIP joint seems to be stiff

and patient is apprehensive with flexor and extensor contraction at attempt of active flex." (Tr. 549, 731). An x-ray study of the left finger was normal. (Tr. 418). Johnson underwent a left long finger steroid injection. Based on Johnson's ongoing complaints regarding his injured left finger, Dr. Masson discussed surgical and non-surgical treatment options with Johnson. Johnson opted for surgery. He underwent a volar wound scar excision and digital nerve neurolysis, flexor tendon lysis of adhesions and dorsal PIPJ capsulectomy. (Tr. 371, 424, 550, 732). Dr. Masson performed the surgery on May 22, 2008. (Tr. 412-15). The surgical note states:

> Peritendinous adhesions of flexor digitorum superficialis of middle finger in palm and finger. Peritendinous adhesions of flexor digitorum profundus middle finger in palm and finger. Late effect of upper extremity laceration. Compression injury of the radial digital nerve of the middle finger. Compression injury of the ulnar digital nerve of the middle finger. (Tr. 412).

Eight days post surgery, Johnson had his first follow up appointment with Dr. Masson and he resumed physical therapy. (Tr. 384, 389-90, 426, 609- 10, 713- 714, 716-17). He was next seen on June 13, 2008, for a 15 day post surgery check. He was given another prescription for physical therapy. (Tr. 394, 395, 429, 430, 612, 613, 726, 427, 433). At his July 2, 2008, follow-up appointment, Johnson reported moderate pain that was related to activity. He also complained about stiffness and limited range of motion. (Tr. 434, 614-16). Johnson's prescription for physical therapy was continued for three days a week, for an additional four weeks. (Tr. 615). At Johnson's appointment in August he continued to complain about his finger locking. Johnson described his pain as severe, it was worse in the evening and would wake him up from a deep sleep. He also reported numbness and tingling. (Tr. 438, 572-573, 767, 771). Dr. Masson noted that Johnson's "LLF exam shows moderate hyperhydrosis, mild improvement with ROM and L hand grip strength." (Tr. 439, 769). Johnson was given a refill of Celebrex and was told to continue with physical

therapy. (Tr. 737, 746, 768-70, 772). Dr. Masson further wrote that "[b]ased on the severity of his

CRPS, he is on schedule and will require therapy for about three months more." (Tr. 439, 769).

Johnson was three months post surgery at his next appointment on September 3, 2008. (Tr.

440-42, 577-78, 762-63). The treatment note reveals that Johnson complained about pain in his left

long finger, as well as tingling and swelling. He also reported that the finger locks at the PIPJ,

especially at night. His examination revealed mild improvement in the range of motion of the

injured finger. He required no pain medication refill. Dr. Masson wrote that "[o]nce his motion and

sensitivity is tolerable, he can return to his treating doctor for final strengthening." (Tr. 442, 578,

763) With respect to Johnson's physical therapy regime, he was instructed to continue sessions three

times a week for four weeks and was prescribed a splint for the injured finger. (Tr. 440, 578, 763).

The medical records reveal that Johnson was next seen by Dr. Masson on October 3, 2008,

four months post surgery. Johnson complained of pain in his left left long finger, as well as stiffness

and swelling in the finger, most often in the evening and that the pain wakes him up. Dr. Masson

noted that Johnson's improvement was slow but it was progressing, especially with therapy. Johnson

underwent a digital steroid sheath injection to make the tissues in his finger more supple. His pain

medications were refilled. (Tr. 404-05, 446-48, 617-18, 736-39, 751-52). Dr. Masson wrote: "I

have advised him that in the last four weeks, he has made significant progress in motion and

sensitivity." (Tr. 621). Johnson's next appointment with Dr. Masson was on November 10, 2008.

(Tr. 406-0707, 468-69, 622-23, 740-41). Johnson, now five and a half months post-surgery,

reported temporary improved range of motion when he wore the splint and that following a steroid

injection, his flexibility increased for about a week. Dr. Masson opined that Johnson had reached

a plateau. *Id.* A week later, on November 17, 2008, Johnson reported he still had pain in his left

long finger and that it was stiff with activity. He was given another injection. Dr. Masson opined that Johnson "should be close to MMI on FU." (Tr. 408-09, 477-78, 624-25, 649). This was Johnson's last office visit with Dr. Masson. He continued with physical therapy and attended sessions on October 23, 2008, (Tr. 455-56), October 30, 2008, (Tr. 457-58), November 3, 2008, (Tr. 459-62), November 6, ,2008 (463-64), November 11, 2008, (Tr. 470-71) November 12, 2008, (Tr. 472-73), November 13, 2008, (Tr. 474-75), November 18, 2008, (Tr. 479-80), November 19, 2008, (Tr. 448-82), November 21, 2008, (Tr. 483-84), November 24, 2008, (Tr. 485-86), November 25, 2008, (Tr. 487-88), November 26, 2008, (Tr. 489-90), December 1, 2008, (Tr. 491-92), December 2, 2008, (Tr. 493-94), December 4, 2008, (Tr. 495-96), December 8, 2008, (Tr. 497-98), December 10, 2008, (Tr. 499-00), and December 11, 2008, (Tr. 501-02). The therapy notes reveal that Johnson ended therapy with 80 degrees of flexion in the left long finger with the splint. (Tr. 502).

The medical records show that during this period, Dr. Grant received updates of Johnson's progress from Dr. Masson. In addition, there are cursory notes written by Dr. Grant during this same period. Many summarized conversations between Dr. Grant and Johnson. (Tr. 544). For instance, Dr. Grant consulted with Johnson on August 4, 2008, concerning Johnson's desire to get a second opinion. (Tr. 745). Another record, an insurance communication log sheet, reveals that on August 3, 2008, Dr.Grant noted that Johnson "was evaluated today by Dr. Massan [and] they discussed his willingness to [return to work] light duty as long as he did not drive and continued with therapy." (Tr. 579). In a subsequent entry dated September 4, 2008, Dr Grant wrote that Johnson was improving, albeit slowly. (Tr. 579). On September 29, 2008, Dr. Grant wrote that Johnson recounted a conversation he had with Dr. Masson about him being put in a return to work program

11

after Johnson completed physical therapy. (Tr. 579). Around this time, Dr. Grant wrote a "To Whom it May Concern" letter dated September 25, 2008, that states: "Mr. Johnson continues under my care. He will be evaluated for return to work status as appropriate. It is our goal for him to return to work fully within the next six months." (Tr. 755). Johnson was next seen by Dr. Grant on November 20, 2008. (Tr. 513, 676). Johnson expressed his unhappiness and frustration that, despite surgery and physical therapy, his finger continued to lock up. Again, Johnson requested another opinion and stated he was open to exploring other treatment options . *(Tr. 513, 676).*

The medical records show that on or about July 27, 2009, Dr. Grant wrote another "To Whom It May Concern" letter, in which he stated that Johnson was disabled from work and was under his care. (Tr. 532, 790). Finally, on December 3, 2009, Dr. Grant completed a form entitled "Assessment of Claimant's Ability to Work" in which he opined that Johnson could walk, stand, and sit for eight hours, could never climb, could rarely crouch and reach, could occasionally balance and stoop, and could frequently bend. With respect to Johnson's ability to lift, Dr. Grant opined the Johnson could not lift because of immobility of the left hand index finger. In addition, he opined that Johnson was limited in his ability to handle (gross manipulation) and finger (fine manipulation) but had no limitations with reaching in all directions and feeling. Dr. Grant responded affirmatively that emotional factors contributed to the severity of his symptoms and functional limitations such as depression and anxiety. He further identified that Johnson's impairments are "reasonably consistent" with his symptoms and functional limitations. Dr. Grant characterized Johnson's pain as constant and opined that Johnson would be incapable of even a low stress job. Based on Johnson's limitations, Dr. Grant opined that Johnson would require eight, fifteen minute rest breaks. He estimated Johnson would be absent from work at least three days per month and that Johnson

only had full use of his right hand.  Dr. Grant did not respond to one question.  The question asked:

"Is your patient a malingerer?"  All other questions were responded to fully by Dr. Grant.  (Tr. 804-06).

Johnson underwent examinations by three other non-treating physicians.  The first examination was performed by Dr. Donald Mauldin, an orthopedist with Occupational Health Systems on December 18, 2008.  (Tr. 158-62, 516-20, 535-40, 627-32, 660-65, 784-89).  Based on his clinical examination and his interview of Johnson, Dr. Mauldin opined that Johnson had status post crush injury of the left long finger, ankylosis of the PIP and DIP joints in the left long finger, status post surgical reconstruction and capsulectomy and tenolysis and neurolysis of the left long finger and possible complex regional pain syndrome.  As to whether Johnson's condition was related to his work place injury on December 27, 2007, Dr. Mauldin wrote:

> The patient has developed significant complication from this injury with a marked adhesion and ankylosis of his PIP and DIP joint along with neuropathic path and possible complex pain-type syndrome secondary to this injury.

In response to whether this medical condition would preclude Johnson from returning to work at the United States Postal Service, Dr. Mauldin opined that, at the moment, Johnson could not work due to not being able to use his left hand for any activities and a chronic pain syndrome.  Overall, Dr. Mauldin concluded that Johnson was developing a complex regional pain syndrome and that the syndrome required a significant amount of pain medication.  Dr. Mauldin further opined that Johnson might benefit from a cervical sympathetic block or possible amputation of the long finger for a more functional hand.  In connection with his report, Dr. Mauldin completed a Department of Labor Form in which he stated that Johnson was "disabled from work at moment."  (Tr. 258).

The records further show that pursuant to Johnson's requests to Dr. Grant for other opinions,

he was examined by Dr. Alan Rosen and Dr. Mark Henry. Johnson was also examined by Dr. Alan

Rosen with the KSF Orthopaedic Center on March 4, 2009. (Tr. 633-35). Dr. Rosen diagnosed

Johnson with left middle finger pain and left middle finger stiffness. Based on his examination, he

wrote:

> I do not believe that I can improve the patient's ROM. His finger is not useful in this
> position. What may be useful at some point, to improve his function would be to
> fuse the PIP joint in flexion to allow better function. I have explained that this
> procedure could potentially make his symptoms of pain worse, and that he could even
> potentially lose the finger. (Tr. 635).

Finally, Johnson was examined by Mark Henry, M.D. on August 27, 2009. Dr. Henry was

with the Hand and Wrist Center of Houston. 779-782). Johnson reported trouble bending his middle

finger and pain mostly at night when he tries to sleep. His primary complaint was pain as well as

stiffness, numbness, weakness, and tingling. Dr. Henry noted a hyperreaction to contact and

stimulation. Dr Henry wrote:

> He had surgery 5/22/08 for attempted improved motion, flexor tenolysis, PIP
> capsulectomy and digital neurolysis. Patient attended therapy after surgery in June.
> He has been considered to have neuropathic regional pain syndrome. This
> information comes from a summary note by Donald Mauldin. I do not have the
> original reports from his treating doctor.

> When asked if he could change one thing about his finger he answers that he wants
> the PIP joint to flex. He is currently at zero. He states he has heard it mentioned to
> amputate the digit and he does not want that. He would rather live with it the way
> it is compared to amputating it.

> Considering the sum of the factors that he is now nearly 2 years from original injury,
> has had a previous tenolysis and casulectomy that failed, and reacts with
> neuropypersensitivity to tissue stimulus, the prospects of a successful new
> tenocapsuloysis are about as grim as one could ever expect. (Tr. 779).

The records further show that two non-examining physicians employed by the Social Security

Administration reviewed Johnson's medical records and offered opinions based on the records. On

14

April 13, 2009, Dr. John Durfor opined that the surgery performed by Dr. Masson had been successful, further opined that Johnson successfully completed physical therapy with exercises. Based on both successes, Johnson had no limitations. (Tr. 641).

Lastly, Dr. Frederick Cremona, a physician with the Disability Determination United, reviewed Johnson's medical records and completed a form entitled "Physical Residual Functional Capacity Assessment." (Tr. 791-98). Based on his review of Johnson's medical records, he diagnosed Johnson with neuropathic pain disorder and ankylosis PIP joint of the left middle finger. Dr. Cremona noted that Johnson's primary desire was for improved range of motion of the middle left finger, which despite surgery and physical therapy did not happen. He noted there was some medical evidence of "ongoing CRPS II." (Tr. 798). Dr. Cremona opined that Johnson could occasionally lift and/or carry up to twenty pounds, could frequently lift and/or carry up to ten pounds, could stand and/or walk about six hours in an eight hour workday, could sit about six hours in an eight hour work day, and was unlimited in his ability to pull and/or pull. With respect to postural limitations, Dr. Cremona opined that Johnson could frequently climb ramps and stairs, balance, stoop, kneel, and crouch. However, he could only occasionally climb ladder/rope/scaffolds and crawl. Johnson had no visual, communicative, or environmental limitations. As to manipulative limitations, he was limited in his ability to perform handling (gross manipulation) and fingering (fine manipulation) to occasional use of his non-dominant left hand.

Here, substantial evidence supports the ALJ's finding that Johnson's laceration to the left middle finger and reflex sympathetic dystrophy[3] were severe impairments at step two, and that such

_____

[3] Reflex Sympathetic Dystrophy Syndrome ("RSDS) also known as Complex Regional Pain Syndrome ("CRPS") is a chronic pain condition that most often resulting from trauma to a single extremity. SSR 03-2p, 2003 WL 22399117 (S.S.A) describes the condition and sets forth

impairments at step three, individually or in combination, did not meet or equal a listed impairment,

that he had the RFC to perform a limited range of light work and was not disabled within the

meaning of the Act.  The ALJ incorporated all of the medical opinions in determining Johnson's

RFC for limited light work.  In particular, the ALJ restricted Johnson's use of the left hand to being

a helper hand to Johnson's right dominant hand.  He further limited Johnson's use of his left hand

to occasional fine fingering and gross handling work.  He was precluded from prolonged writing and

frequent keyboarding.  Also, in recognition of the pain medications that had been prescribed to

---

the process for evaluating this impairment.  According to the ruling,

> the most common acute clinical manifestations include complaints of intense pain
> and findings indicative of autonomic dysfunction at the site of the precipitating
> trauma.  Later, spontaneously occurring pain may be associated with
> abnormalities in the affected region involving the skin, subcutaneous tissue, and
> bone.  It is characteristic of this syndrome that the degree of pain reported is out of
> proportion to the severity of the injury sustained by the individual....Although the
> pathogenesis of this disorder (the precipitating mechanism(s) of the signs and
> symptoms characteristic of RSDS/CRPS) has not been defined, dysfunction of the
> sympathetic nervous system has been strongly implicated.  2003 WL 2239917*1.

The Ruling further provides that

> RSDS/CRPS patients typically report persistent, burning, aching or searing pain
> that is initially localized to the site of injury.  The involved area usually has
> increased sensitivity to touch.  The degree of pain is often out of proportion to the
> severity of the precipitating injury.  Without appropriate treatment, the pain and
> associated atrophic skin and bone changes may spread to involve an entire limb.
> Cases have been reported to progress and spread to other limbs, or to remote parts
> of the body.  *Id.  at *2.*

With respect to how RSDS/CRPS is identified as a medically determinable impairment,
the Ruling states in pertinent part:

> [w]hen longitudinal treatment records document persistent limiting pain in an area
> where one or more of these abnormal signs has been documented at some point in
> time since the date of the precipitating injury, disability adjudicators can reliably
> determine that RSDS/CRPS is present and constitutes a medically determinable
> impairment.  It may be noted in the treatment records that these signs are not
> present continuously, or the signs may be present at one examination and not
> appear at another.  Transient findings are characteristic of RSDS/CRPS, and do
> not affect a finding that a medically determinable impairment is present.  *Id.  at
> *4.*

control the symptoms associated with CRPS, Johnson was precluded from commercial driving. This factor weighs in favor of the ALJ's decision.

To the extent the ALJ failed to mention Ruling 03-2p in his decision, upon this record, no substantial rights were affected by this oversight. Social Security Rulings such as Ruling 03-2p are published under authority of the Commissioner and are binding on the Administration. *Hall v. Schweiker*, 660 F.2d 116, 119 n.4 (5th Cir. [Unit A] 1981)(per curiam). An Agency must follow its own procedures, even if those procedures are more rigorous than what would otherwise be required. *Id.* However, the failure by the Commissioner to follow a procedure promulgated by the Agency does not *per se* warrant a remand. Only where substantial rights have been affected is a remand required. *Mays v. Bowen*, 837 F.2d 1362, 1364 (1988). *See also Hall*, 660 F.2d at 119 (requiring a show of prejudice resulting from the agency's violation of its internal rules). In the instant action, even though the ALJ did not cite to SSR 03-2p in his decision, his decision nonetheless comports with and is consistent with SSR 03-2p. The ALJ applied SSR 96-7p in evaluating Johnson's symptoms, and both SSR 03-2p and SSR 96-7p apply the same standards. In particular, both require the the ALJ to evaluate the intensity, persistence, and limiting effects of the claimant's symptoms. Where a claimant's statements are not borne out by the objective medical evidence, the ALJ is directed under both rulings to make a credibility determination that is based on the totality of the record. Because the ALJ followed the same sequential steps and procedures, his failure to mention SSR 03-2p, does not require a remand as no substantial rights were affected by this oversight.

## B. Diagnosis and Expert Opinion

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact. Unless good cause is shown to the contrary,

"the opinion, diagnosis, and medical evidence of the treating physician, especially when the consultation has been over a considerable amount of time, should be accorded considerable weight." *Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir. 1981). For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusional and must be supported by clinical and laboratory findings. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981). Indeed, "[a] treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with ... other substantial evidence.'" *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (quoting *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995)). The opinion of a medical specialist is generally accorded more weight than opinions of non-specialists. *Id.* "'[T]he Commissioner is free to reject the opinion of any physician when the evidence supports a contrary conclusion.'" *Martinez*, 64 F.3d at 176 (quoting *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)). Further, regardless of the opinions and diagnoses of medical sources, "the ALJ has sole responsibility for determining a claimant's disability status." *Martinez*, 64 F.3d at 176.

The Social Security Regulations provide a framework for the consideration of medical opinions. Under 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6), consideration of a physician's opinion must be based on:

(1)     the physician's length of treatment of the claimant,

(2)     the physician's frequency of examination,

(3)     the nature and extent of the treatment relationship,

(4)     the support of the physician's opinion afforded by the medical evidence of

record,

(5)     the consistency of the opinion with the record as a whole, and

(6)     the specialization of the treating physician.

*Newton,* 209 F.3d at 456.  While opinions of treating physicians need not be accorded controlling

weight on the issue of disability, in most cases such opinions must at least be given considerable

deference.  *Id.*  Again, the Social Security Regulations provide guidance on this point.  Social

Security Ruling 96-2p provides:

> [A] finding that a treating source medical opinion is not well supported by medically
> acceptable clinical and laboratory diagnostic techniques or is inconsistent with the
> other substantial evidence in the case record means only that the opinion is not
> entitled to "controlling weight," not that the opinion should be rejected.  Treating
> source medical opinions are still entitled to deference and must be weighed using all
> of the factors provided in 20 C.F.R. 404.1527 and 416.927.  In many cases, a treating
> source's medical opinion will be entitled to the greatest weight and should be
> adopted, even if it does not meet the test for controlling weight.

Social Security Ruling (SSR) 96-2p, 61 Fed. Reg.34490 (July 2, 1996).  With regard to the weight

to be given "Residual Functional Capacity Assessments and Medical Source Statements," the Rule

provides that "adjudicators must weigh medical source statements under the rules set out in 20

C.F.R. 404.1527 ... providing appropriate explanations for accepting or rejecting such opinion."  *Id.*

The Fifth Circuit adheres to the view that before a medical opinion of a treating physician

can be rejected, the ALJ must consider and weigh the six factors set forth in 20 C.F.R.

§ 404.1527(d).  *Newton,* 209 F.2d at 456.  "The ALJ's decision must stand or fall with the reasons

set forth in the ALJ's decision, as adopted by the Appeals Council."  *Id.* at 455; *see also Cole v.*

*Barnhart,* 288 F.3d 149, 151 (5th Cir. 2002) ("It is well-established that we may only affirm the

Commissioner's decision on the grounds which he stated for doing so.").  However, perfection in

administrative proceedings is not required. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

Here, the thoroughness of the ALJ's decision shows that he carefully considered the medical records and testimony, and that his determination reflects those findings accurately.  The ALJ summarized the evidence and set forth specific reasons concerning the weight given to the opinions of the medical sources.

Johnson contends that ALJ erred by disregarding the disability opinions of his treating physician, Dr. Grant, and by failing to consider his extensive physical therapy records.[4]  Johnson contends that despite being under constant medical care since injuring his left middle finger, he has been and continues to be unable to work due to his injury. Johnson contends that he has not regained full use of his middle left finger, and that the ALJ erred in refuting Dr. Grant's opinion concerning his total disability without setting forth a detailed explanation for discounting in its entirety Dr. Grant's conclusion that Johnson was disabled. Johnson maintains that he has not been and is most likely will never be a viable candidate of sustained full time competitive employment given his need to be absent from work for physical therapy sessions, surgery, steroid injections, and consultations concerning potential fusion or amputation of his left index finger.  According to Johnson, the ALJ failed to adequately consider the totality of his physical therapy records.  Johnson argues the ALJ

---

[4] To the extent that Johnson argues the ALJ failed to consider the nature and amount of physical therapy sessions attended by Johnson, the record refutes this contention.  The ALJ took the records in account when evaluating Johnson's allegations.  Moreover, physical therapists like chiropractors are not "acceptable medical sources" under the regulations.  20 C.F.R. §404.1513(d) and 416.913(d).  Only "acceptable medical sources" can provide "medical opinions" to show the severity of a claimant's impairment and how it affects his functional ability.  20 C.F.R. §1527(a)(2) and 416.927(a)(2).  The ALJ's decision shows that he considered Johnson's physical therapy sessions, including the frequency.  Other than Johnson's contention that he would be unable to sustain gainful employment due to his need to be absent from work to attend physical therapy sessions, the medical records do not suggest that there was an ongoing need for physical therapy.

selectively culled through the physical therapy and medical records to support the ALJ's finding that Johnson was not disabled. The Commissioner responds that the ALJ weighed the medical opinions in accord with 20 C.F.R. §404.1527(d) and set forth specific reasons for the weight given the physician opinions, and in particular the opinions of Dr. Grant, Johnson's treating physician, and Dr. Mauldin, a one time, examining physician. The Commissioner responds that the opinions were not discounted in their entirety but were considered in context with the other medical records and opinions offered by other examining and non-examining physicians.

With respect to the opinions and diagnoses of treating physicians and medical sources, the ALJ wrote:

> As for the opinion evidence, the undersigned is cognizant that Howard Grant, M.D., has submitted an undated statement indicating that the claimant was totally "disable" at the moment (Exhibit 1F, page 2). The doctor also completed forms in January 2008, February 2008 and March 2008 indicating that the claimant was unable to perform any activities on a continuous or intermittent basis (Exhibit 7F, page 18; and Exhibit 11F, pages 11, 13, and 16). Dr. Grant subsequently completed a report in July 2009 indicating that the claimant was "disabled" from work (Exhibit 9F, page 30; and Exhibit 14F, page 13). In a Assessment completed in December 2009, Dr. Grant indicated that the claimant was unable to lift and carry any amount of weight, and was (sic) limited his ability to handle and finger. The doctor also reported that the claimant was experiencing depression and anxiety which affected his physical condition and was incapable of even a low stress job. Dr. Grant further indicated that the claimant would need to take breaks as frequently as 8 times during an 8 hour workday, and was likely to be absent from work as result of impairments or treatment about 3 days a month (Exhibit 17F).

> The undersigned, however, has afforded little weight to the opinions rendered by Dr. Grant, as they are inconsistent with the objective medical evidence noted in his treatment records. Specifically, as discussed in detail above, treatment records reflect that the claimant has complained only of pain in his left middle finger. During an examination performed in February 2008, Dr. Grant noted that the claimant had "mild" soft tissue swelling, as well as limited and painful movement in his left middle index finger only. The doctor specifically noted, however, that the claimant was right hand dominant (Exhibit 9F, page 42). In March 2008 Dr. Grant reported that the claimant had tightness and tenderness with palpation of the middle third

21

finger with mild tissue swelling. The doctor subsequently noted, however, that the claimant was "clinically stable" (Exhibit 11F, page 15). It is noted that during these examinations, Dr. Grant reported no symptoms of depression or anxiety (Exhibit 9F, page 42; and Exhibit 11F, page 15). Moreover, progress notes submitted subsequent to March 2008, simply reflect treatment performed by other physicians, and contain no evidence that Dr. Grant actually performed any examinations (Exhibit 9F, pages 11 and 12; and Exhibit 7F, pages 2, 3, 4, 27, and 31). Given the above, Dr. Grant's assessments are not considered to be reflective of treatment records or the claimant's ability to function.

The undersigned is also aware that following an examination performed in December 2008, Dr. Mauldin opined that the claimant had a "disability" and a chronic pain condition which precluded gainful employment (Exhibit 11F, page 44). The doctor also completed a Work Capacity Evaluation indicating that the claimant was "disabled" from work (Exhibit 6F, page 8; Exhibit 9F, page 38; and Exhibit 11F, page 47). During the physical examination, however, Dr. Mauldin reported no abnormalities of the claimant's lower extremities or right upper extremity. As discussed earlier, the doctor reported decreased sensation in the long finger of the left hand, with temperature changes, and ankylosing of the proximal interphalangeal joint. Dr. Mauldin specifically noted that the claimant had no abnormalities of his left wrist, elbow or shoulder regions. (Exhibit 11F, page 43). Dr. Mauldin's assessment of the claimant's functional limitations is not supported by the objective evidence stated in the body of his report. Consequently, his opinion has been afforded little weight. Moreover, the doctor's statement regarding the claimant being "disabled" is a matter reserved for the Commissioner.

The State Agency medical consultants completed a Case Assessment Form in April 2009 indicating that the claimant did not have a "severe" impairment (Exhibit 12F). At the reconsideration level, however, the State Agency medical consultant completed a Physical Residual Functional Capacity Assessment indicating that the claimant was able to lift and/or carry 10 pounds frequently and 20 pounds occasionally, stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday, and sit (with normal breaks) for a total of about 6-hours in an 8-hour workday. The doctor further opined that the claimant was unlimited in his ability to push and/or pull, and could only occasionally crawl and climb ladders, ropes and scaffolds. The State Agency medical consultant opined that the claimant was limited to only occasional handling and fingering with the left non-dominant extremity (Exhibit 15F). While some weight has been afforded to the opinions rendered by the State Agency medical consultants which also support a conclusion that the claimant is "not disabled," based on the medical evidence of record, including evidence submitted at the hearing level, the undersigned concludes that the claimant is limited to light work as set forth in this decision. (Tr. 16-17).

22

As to Johnson's contention that the ALJ erred by discounting Dr. Grant's opinion that he was disabled, the law is clear that "among the opinions by treating doctors that have no special significance are determinations that an applicant is 'disabled' or 'unable to work.'" *Frank v. Barnhart*, 326 F3d 618, 620(5th Cir. 2003). As such, to the extent that Dr. Grant opined that Johnson was "disabled" or Dr. Mauldin opined that he "was disabled at this time," such conclusions are not determinative and binding on the ALJ.

With respect to Johnson's contention that the ALJ should have given greater weight to Dr. Grant's opinions, it is undisputed that Dr. Grant was Johnson's treating physician following his injury and that he later managed his care after he referred him to Dr. Masson. He also referred him for evaluations by Dr. Rosen and Dr. Henry. However, there is a paucity of detail in Dr. Grant's his records. Most of the entries are descriptive summaries of conversations Dr. Grant had with Johnson. Absent are detailed clinical findings that support Dr. Grant's conclusion that Johnson was disabled. The ALJ set forth specific and detailed weight given to Dr. Grant's opinion. The Court concludes that the diagnosis and expert opinion factor also supports the ALJ's decision.

## C. Subjective Evidence of Pain

The next element to be weighed is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends. Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled. *Cook*, 750 F.2d at 395. The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423. The statute provides that allegations of pain do not constitute conclusive evidence of disability. There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause pain. Statements

23

made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on the record. 42 U.S.C. § 423. "Pain constitutes a disabling condition under the SSA only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Selders*, 914 F.2d at 618-19 (citing *Darrell v. Bowen*, 837 F.2d 471, 480 (5th Cir. 1988)). Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform. *See Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994). The Act requires this Court's findings to be deferential. The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has had the opportunity to observe the claimant. *Hames*, 707 F.2d at 166.

Here, Johnson testified about his health and its impact on his daily activities. He offered no testimony or corroboration from his family or friends with respect to his complaints about his condition. Johnson testified that he can no longer use his left hand and left middle finger "at all." (Tr. 29-30). According to Johnson, his health is "bad." (Tr. 29). Johnson stated that his left arm and hand hurt and he had problems with his right hand and right arm due to overuse. (Tr. 29-30, 32). Johnson described the pain in his left hand as constant, sharp and throbbing, and that any motion of the hand causes pain. (Tr. 30, 33). On a scale of one to ten, with ten being the most severe, Johnson rated his level of pain as a ten. (Tr. 31). To alleviate his pain, Johnson testified that he wears a splint and holds his hand close to his chest. (Tr. 30-31). Johnson further stated that his pain medication makes him throw up. (Tr. 32). With respect to his physical activities, Johnson estimated that he could stand for approximately 30 minutes, could sit for no more than 30 minutes, and could not climb stairs. (Tr. 33-34). He stated he could do no lifting, bending, stooping or crouching. (Tr. 34). In addition to his physical complaints, Johnson testified that his concentration

is poor and he has memory problems. (Tr. 35). With a low energy level, Johnson described every

day as a "bad day." (Tr. 36). As to his daily activities, Johnson testified he lives with his wife and

three daughters. (Tr. 36). He does no housework, yard work, laundry, cooking, or grocery

shopping. (Tr. 36). A typical day consists of getting up late, due to trouble sleeping; getting

dressed; eating lunch; and resting most of the day. He watches television to pass the day. He also

attends physical therapy five days a week. (Tr. 38-39). As far as activities outside of the home,

Johnson stated he no longer drives, goes to movies, or eats out. (Tr. 37). He added that he attends

church and has a few visitors. (Tr. 37). This is in contrast to his activities before he injured his left

middle finger, which included playing basketball and bike riding. (Tr. 37).

Based on the reasons which follow, the ALJ rejected Johnson's testimony as not fully

credible:

> The claimant testified that he sustained an injury to the tendons in his left middle finger while working in December 2007. Indicating that he is unable to use his left hand and arm, the claimant testified that he experiences constant pain throughout his left upper extremity. The claimant subsequently rated his pain as being a "10," and testified that as a result of his pain, he is unable to stand for longer than 15 to 20 minutes, or sit for longer than 15 to 20 minutes, or sit for longer than 30 minutes. The claimant also testified that he is limited in his ability to walk, and is unable to bend, stoop, crouch, reach out with his left hand or use his left hand to perform activities such as buttoning clothes. The claimant subsequently testified that due to overuse, he is also experiencing constant pain in his right shoulder and arm. Additionally, the claimant testified that he has vomiting associated with medications.

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

> Specifically, the record fails to support the claimant's allegations of disabling pain. Factors for consideration in evaluating an individual's subjective complaints of pain include whether there is documentation of persistent limitations of range of motion,

25

muscle spasms, muscular atrophy from lack of use, significant neurological deficits, weight loss or impairment of general nutrition, and non-alleviation of symptoms by medication. *Hollis v. Bowen*, 837 F.2d 1378, 1384 (5th Cir. 1988); *Adams v. Bowen*, 883 F.2d 509, 512 (5th Cir. 1987). None of the claimant's examinations have disclosed any of the above factors to any significant degree.

The medical record reflects that the claimant sustained a laceration to his left middle index finger on December 27, 2007, which required 12 stitches (Exhibit 1F, pages, 2, 4, 11 and 16). The claimant subsequently underwent x-rays of the left hand on January 25, 2008, which were assessed as being normal, with no evidence of degenerative changes, fracture, lysis or sclerotic lesions (Exhibit 1F, pages 2 and 21). Progress notes reflect, however, that the claimant continued to complain of pain when seen in March 2008. Following the physical examination which revealed mild soft tissue swelling of the left middle index finger, with limited and painful movement, physical therapy was prescribed (Exhibit 1F, page 22).

The record documents that when seen by Marcos Masson, M.D., in April 2008, the claimant complained of "severe" pain in his left long finger (Exhibit 1F, page 2; Exhibit 7F, page 7; and Exhibit 8F, page 8). On examination, it was noted that the claimant had no abnormalities of the neck, shoulders, or elbows (Exhibit 7F, page 115). There were no deficiencies or instability of the left hand. Percussion examinations and compression examinations were negative. Monofilament tests were also normal. The claimant, however, had hypersensitivity to the volar aspect of the left long finger from the PIP joint distally (Exhibit 8F, pages 8 and 9). Dr. Masson also noted that the PIP joint seemed stiff, and the claimant was apprehensive with flexor and extensor co-contraction. Following the examination, the claimant was assessed as having a digital injury and RSD. Surgery was also recommended (Exhibit 7F, page 114). The record reflects that the claimant underwent reconstruction, capsulectomy tenolysis and neurolysis of the left long finger on May 22, 2008, with post-operative physical therapy (Exhibit 5F, page 4; and Exhibit 8F, pages 4 and 16).

Contrary to the claimant's allegations of an inability to use his left arm/hand, progress notes reflect that when seen in September 2008, the claimant reported moderate improvement in range of motion of the left hand. The claimant also rated the severity of his pain as being 5 out of 10 (Exhibit 9F, page 75). When seem by Dr. Masson in November 2008, the claimant was 5 months post surgery, reported that he was having pain and stiffness of the left long finger which he rated as being 5 out of 10. The claimant also reported that his symptoms occurred randomly. On examination, the claimant had point tenderness and limited range of motion of the left long finger only. There was no evidence of first web contracture and Allen tests were normal. The claimant's grip strength was 45 pounds on the left and 105 on the right. Dr. Masson also noted that the claimant had normal findings in respect to the

26

shoulder and elbow (Exhibit 11F, page 39). Following the examination, Dr. Masson noted that as a result of a sheath injection and the use of a special brace, the claimant had made significant improvement in regard to digital flexion at the PIP joint (Exhibit 11F, page 40).

The record reflects that when examined by Donald Mauldin, M.D. in December 2008, the claimant complained of constant finger pain, and difficulty using his left hand. The physical examination revealed coolness to the long finger with some temperature differential in the left hand, compared to the right. The interphalangeal joint was completely ankylosed with no passive or active movement. The claimant also had a flexion contracture at the DIP of approximately 30 degrees with no passive movement, or active flexion or extension. There was full extension at the metocarpophalangeal joint. Sensation was also noted to be decreased both radially and on the ulnar side of the long finger. Dr. Mauldin specifically noted, however, that the claimant had no abnormalities of his wrist, elbow or shoulder region (Exhibit 6F, page 4). Physical therapy records also reflect that when seen in December 2008 the claimant also rated his pain as being moderate at 5/10 (Exhibit 8F, pages 82, 86, 88 and 90).

Alan Rosen, M.D. subsequently reported that when seen in March 2009, the claimant complained of stiffness, and a "shocking and tingling" sensation in his left middle finger. He also reported aching of the left hand only with cold weather (Exhibit 5F, page 4). There was no evidenced (sic) no swelling or erythema of the left middle finger. There was tenderness at the DIP joint of the left middle finger. The claimant had no active motion of the PIP joint, and there was 30 degrees of extensor lag at the DIP joint (Exhibit 5F, page 3). Following the examination, Dr. Rosen assessed the claimant as having left middle finger pain, and left middle finger stiffness. He also noted that the claimant's finger was not useful in its current position, and at some point it might be useful to fuse the PIP joint in flexion (Exhibit 5F, page 3). The record reflects that when examined by Mark Henry, M.D. in August 2009, the claimant had neuropathic over-response in the left hand. His grip strength was 15 kg on the left and 32 kg on the right. The claimant's muscle strength in the fingers, however, was symmetrical throughout both hands. Range of motion of the elbows, forearms, wrists, and thumbs was also equal in both upper extremities. In regard to the long finger, the claimant had MP flexion of only 80 degrees on the left compared to 90 degrees on the right. The claimant had no flexion of the PIP joint, and flexion of the DIP joint was 40 degrees on the left, compared to 50 on the right. Ligament stability, however was within normal limits in both upper extremities. X-rays of the left hand also revealed no evidence of any fracture, dislocation or subluxation. Soft tissue shadows were also normal (Exhibit 14F, page 5).

The medical record, as discussed above, fails to support the claimant's allegations of ongoing and disabling symptoms. The record also contains no evidence to support

the claimant's allegations that he experiences vomiting associated with his medication. Specifically, the record contains no evidence that the claimant has ever reported this particular side effect to treating sources. The Courts have held that the Administrative Law Judge may properly consider the objective medical evidence in testing credibility and finding the subjective complaints exaggerated. *Johnson v. Heckler*, 767 F.2d 180 (5th Cir. 1985).

The claimant has alleged limited activities of daily living (Exhibit 7E). Two factors, however, weigh against considering these allegations to be strong evidence in favor of finding the claimant disabled. First, allegedly limited activities of daily living cannot be objectively verified with any reasonable degree of certainty. Secondly, even if the claimant's daily activities were truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical conditions, as opposed to other reasons, in view of the medical evidence.

The undersigned is cognizant, however, that the objective medical evidence is only one factor taken into consideration for a finding on credibility. Other factors include the extent of medical treatment and relief from medication and therapy, the claimant's work history, the claimant's daily activities, attempts to seek relief from symptoms, and the extent, frequency, and duration of symptoms. Taking all of these factors into consideration, as well as the claimant's statement in August 2009 that he was experiencing most of his pain at night (Exhibit 14F, page 3), the undersigned finds the claimant's allegations of an inability to perform all work related activities to be unsupported. (Tr. 13-16).

The undersigned finds that there is nothing in the record to suggest that the ALJ made improper credibility findings, or that he weighed the testimony improperly. The ALJ, in accord with SSR 96-7p, considered several factors in assessing Johnson's credibility such as his daily activities; the location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate symptoms; the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; treatment, other than medication, for relief of pain or other symptoms; measures other than treatment the claimant uses to relieve pain or other symptoms; and any other factors concerning his functional limitations and restrictions due to pain or other symptoms. Based on this record, there are significant inconsistencies between Johnson's subjective

complaints and the objective medical evidence.  The ALJ identified the inconsistencies and gave specific reasons for rejecting Johnson's subjective complaints, such as never complaining about vomiting or mentioning his overuse of his right hand.  Accordingly, this factor also supports the ALJ's decision.

### D. Education, Work History, and Age

The final element to be weighed is the claimant's educational background, work history and present age.  A claimant will be determined to be under disability only if the claimant's physical or mental impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 423(d)(2)(A).

The record shows that Johnson, at the time of the hearing, was forty-five years old, and had completed high school.  The ALJ questioned Laurie McCrade, Ph.D., a vocational expert ("VE"), at the hearing about Johnson's ability to engage in gainful work activities.  "A vocational expert is called to testify because of his familiarity with job requirements and working conditions. 'The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)).  It is well settled that a vocational expert's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence.  *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).  A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record. Beyond the hypothetical question posed by the ALJ, the ALJ must give the claimant the "opportunity to correct deficiencies in the ALJ's hypothetical

questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)." *Bowling*, 36 F.3d at 436.

The ALJ posed the following hypothetical questions to the VE:

Q. Okay, very good. Let's see, let's consider a hypothetical individual the same age, education, and work experience as the claimant relegated to light work. And additionally limited to only occasional use for fine fingering and gross handling of the left extremity. In addition to that no prolonged writing or frequent keyboard work. What I'm really visualizing there is using the left extremity as, it's non-dominant, but using it as a helper.

A. Um-hum.

Q. Also, no commercial driving, again, due to the side affects of medication. Would he be able to do any of his past work?

A. No.

Q. Any transferable skills under the hypothetical?

A. No.

Q. Okay. Let's see, would you be able to identify other work a person of that description would be able to do?

A. May I clarify the—

Q. Sure.

A. — the dominant hand, sir?

Yes, You're right-handed are you, sir?

Claimant: Yes, sir.

Q. Okay. So —

A. Yes, we would review the light, unskilled job base administratively recognized by the Commissioner. In that instance occupation such as a school crossing guard, 371.567-010 with an SVP; 2. Existing by 100,000 in the national economy and approximately 1,200 to 1,500 in the local regional economy.

Q.: Would you give me that DOT number again?

A. Yes, 371.567-010. Something like a linen grader, 361.687-022 with a SVP: 2. Existing by 500,000 nationally and 5,000 in the local regional economy. A, let's see, a garment sorter, 222.687-014. Existing by 850,000 in the national economy and 6,000 in the local regional economy. I gave you the number, right?

Q. Yeah, 222.687-014.

A. Okay, SVP: 2.

Q. Okay. Same non-exertional limitations. Let's drop him to sedentary work. Would there be any jobs?

A. You know, it's really my opinion that the erosion to that job base would be so significant that it would preclude performance of any sedentary, unskilled work.

Q. Okay. Finally, let's go to – can you customarily, or explain what's customarily expected by employers in terms of absences, routine rest break periods, as well as time on task expectations?

A. Yes. Customary work breaks are 15 minutes in the morning, 15 in the afternoon, and it contemplates an hour for lunch. It's my professional opinion that if an individual is missing more than two to three days consistently per month that would not be tolerated such beyond 90 days. And that person has to remain focused on task in order to complete a workday or complete those tasks between 75 and 80 percent of the day.

Q. Okay. And exceeding those customary limits on the regular basis would eliminate not only those jobs that you described previously but all competitive employment?

A. Yes.

Q. Okay. Any conflict between your testimony and the definitions in the Dictionary of Occupational Titles?

A.: No. (Tr.40-43).

Here, the ALJ relied on a comprehensive hypothetical question to the vocational expert. A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record. Upon this record, there is an accurate and logical

bridge from the evidence to the ALJ's conclusion that Johnson was not disabled.  Based on the

testimony of the vocational expert and the medical records, substantial evidence supports the ALJ's

finding that Johnson could perform a limited range of light work.  All the jobs identified by the VE

were consistent with Johnson's RFC, and are types of jobs that could be performed based on a

restricted range of light work, given Johnson's age and education.  Because the hypothetical

questions contained all the functional limitations recognized by the ALJ, the Court concludes that

the ALJ's reliance on the vocational testimony was proper, and that the vocational expert's

testimony, along with the medical evidence, constitutes substantial evidence to support the ALJ's

conclusion that Johnson was not disabled within the meaning of the Act and therefore was not

entitled to benefits.  Further, it is clear from the record that the proper legal standards were used to

evaluate the evidence presented.  Accordingly, this factor also weighs in favor of the ALJ's decision.

## V. Conclusion

Considering the record as a whole, the Court is of the opinion that the ALJ and the

Commissioner properly used the guidelines propounded by the Social Security Administration,

which direct a finding that Johnson  was not disabled within the meaning of the Act, that substantial

evidence supports the ALJ's decision, and that the Commissioner's decision should be affirmed.  As

such, it is

ORDERED Plaintiff's Motion for Summary Judgment (Document No. 10), is  DENIED,

Defendant's Motion for Summary Judgment (Document No.7) is GRANTED, and the decision of

the Commissioner of Social Security is AFFIRMED.

Signed at Houston, Texas, this 14th day of August , 2012

FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE